**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **MARY SARGENT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **24-11500-BEM** |
| | ) | |
| **SUN LIFE ASSURANCE COMPANY** | ) | |
| **OF CANADA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON**
**PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**MURPHY, J.**

Plaintiff Mary Sargent brings this action against Defendant Sun Life Assurance Company

of Canada's ("Sun Life") pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Sargent seeks reinstatement of her long-term disability

("LTD") benefits.  Before the Court are the parties' cross-motions for summary judgment.  For the

reasons below, the Court will grant Defendant's motion for summary judgment and deny

Plaintiff's motion for summary judgment.

**I.    Background**

    **A.    Factual Background**

Sargent was employed as a Senior Director of New Business Development for Philips

North America LLC ("Phillips") until December 31, 2018.  Dkt. 50-8 at 649.[1]  Sargent ceased

---

[1] The Court notes that it granted permission to the parties to omit statements of facts in their memoranda in support of their motions for summary judgment.  Dkt. 34.  Because the record spans more than 6,500 pages, the Court provides only an abbreviated overview here, with additional facts included in the analysis as needed.

working due to significant pain, fatigue, a lack of endurance, and cognitive limitations stemming from a non-work-related shoulder injury, which she says caused shoulder pain, neck and head pain, and nerve pains later diagnosed as fibromyalgia, bilateral occipital neuralgia, dysthymia, cervical degenerative disc disease, temporomandibular dysfunction, and trigeminal neuralgia. *See, e.g.*, Dkt. 50-9 at 598; Dkt. 50-8 at 657; Dkt. 50-5 at 36, 102. Phillips maintained a Group Insurance Policy (the "Plan") through Sun Life, which provided disability benefits for eligible employees.[2] Dkt. 50-7 at 404–35.

The Plan defines "Disability" and "Disabled" as follows. For the first twenty-four months following a 180-day "Elimination Period," a claimant is considered "Totally Disabled" if she is "unable to perform one or more of the Material and Substantial duties of [her] Regular Occupation." Dkt. 50-7 at 408, 412, 416. After this initial twenty-four-month period, the definition narrows eligibility: to remain entitled for LTD benefits, a claimant must then demonstrate that she "is unable to perform with reasonable continuity any Gainful Occupation for which [she is] or could become reasonably qualified for by education, training and experience." *Id.* at 416. The Plan defines "Gainful Occupation" as "employment that is, or can be expected, to provide" an income of at least fifty percent of the claimant's prior monthly earnings. *Id.* at 407, 412. A claimant bears the burden of demonstrating eligibility for benefits, which requires submitting proof, defined as "any medical, financial, or other information that [Sun Life] require[s] to make a claim determination," *id.* at 415, including "evidence demonstrating the disability," which "should include at least Hospital records, Physician records, psychiatric records, x-rays, narrative reports, or lab, toxicology or other diagnostic testing materials as appropriate for the

---

[2] There is no dispute that Sargent was an eligible employee under the Plan.

disabling condition," *id.* at 426.  Under the Plan, Sun Life is responsible for determining Plan participants' eligibility for benefits under the Plan.  *Id.* at 426–28, 432.

After receiving short-term disability benefits from Sun Life under the Plan, Sargent timely submitted her application for LTD benefits on July 5, 2019, which included a statement from her attending physician, Dr. Douglas Black, that Sargent should not drive or work and that "sitting exacerbate[s] pain."  Dkt. 50-8 at 645–74.  On July 26, 2019, Sun Life approved LTD benefits, effective July 9, 2019.  Dkt. 50-6 at 239.

On September 26, 2019, Sargent's application for disability benefits through a private policy was approved.  Dkt. 50-2 at 13–14.  Sargent also applied for and received Social Security Administration ("SSA") benefits beginning on June 28, 2021, retroactive to June 2019.[3]  Dkt. 50-8 at 640; Dkt. 50-9 at 35.  The SSA determination included a doctor's conclusion that "[d]ue to a combination of pain, inattention, cognitive slowing and issues with executive function, [Sargent] will not be able to maintain a pace for two hour periods and will have an unreasonable number of interruptions to pace."  Dkt. 50-2 at 202.

On January 26, 2021, Sun Life provided Sargent with a six-month notice stating that, effective July 8, 2021, she would hit the twenty-four month mark of receiving benefits—the point at which the Plan's eligibility definition narrows—and thus would continue to qualify for benefits only if she remained unable to "perform the duties of *any* gainful occupation, based on her education, training, or experience."  Dkt. 50-6 at 275–77 (emphasis in original); *see also* Dkt. 50-7 at 416 (defining eligibility after twenty-four months as "unable to perform with reasonable

---

[3] Later, Sun Life determined that the Social Security benefits earned by Sargent during the internal review process from July 8, 2021, to September 28, 2022, constituted income that should have offset her monthly benefit amounts.  Dkt. 50-10 at 15–17.

continuity any Gainful Occupation for which [she is] or could become reasonably qualified for by education, training and experience").

From 2019 to 2022, Sun Life continued to gather additional records to complete periodic reviews of Sargent's eligibility, *see, e.g.*, Dkt. 50-6 at 241 (discussing periodic reviews for eligibility), and to assess Sargent's eligibility under the new requirements.[4]   During this time, Sargent and her healthcare providers regularly kept Sun Life informed of her treatment status and ongoing medical status, *e.g.*, Dkt. 50-9 at 110–11 (April 29, 2020 memorandum memorializing a call between Sun Life case manager and Sargent); Dkt. 50-2 at 379–86 (October 13, 2020 report by Dr. Kaaren Bekken); Dkt. 50-7 at 108–16 (June 18, 2021 report by Dr. Bekken); Dkt. 50-5 at 107–10 (medical records from a March 1, 2022 visit with Dr. Hsinlin Thomas Cheng); Dkt. 50-5 at 101–06 (Residual Function Capacity form completed by Dr. Andrew Rosen on May 12, 2022); Dkt. 50-5 at 46–57 (Residual Function Capacity form completed by Dr. John J. Marchese on June 29, 2022), and Sun Life retained independent doctors to review Sargent's file and conduct independent evaluations of Sargent, *e.g.*, Dkt. 50-10 at 27–31 (August 20, 2020 report by Dr. Saima Khalid); Dkt. 50-6 at 559–60 (December 29, 2020 report by Clinical Social Worker Bonnie Schafer); Dkt. 50-10 at 59–62 (January 14, 2021 report by Dr. Michael Chilungu); Dkt. 50-9 at 106–07 (February 18, 2021 addendum to report by Dr. Khalid); Dkt. 50-9 at 116–18 (February 3, 2021 addendum to report by Dr. Chilungu); Dkt. 50-10 at 36–44 (September 16, 2021 report by Dr. David Miller); Dkt. 50-10 at 19–21 (October 25, 2021 addendum to report by Dr. Miller); Dkt. 50-5 at 162–76 (March 19, 2022 report by Dr. Malissa Kraft); Dkt. 50-6 at 234–35 (March 30, 2022 addendum to report by Dr. Kraft); Dkt. 50-5 at 65–72 (June 23, 2022 addendum

---

[4] During this time, Sun Life continued paying Sargent LTD benefits under a reservation of rights. *See* Dkt. 50-5 at 78.

4

to report by Dr. Chilungu); Dkt. 50-5 at 28–39 (July 28, 2022 report by Dr. Steven Winkel); *id.* at 4–6 (August 31, 2022 addendum to report by Dr. Winkel); Dkt. 50-3 at 958–61 (September 23, 2022 report by Vocational Rehabilitation Consultant Cristi Calloway).

Ultimately, Sun Life's reviewing doctors and consultants concluded that Sargent could work pursuant to the Gainful Employment standard under the Plan, despite her illnesses and pain. *See, e.g.*, Dkt. 50-9 at 115 ("No detailed cognitive testing is documented in the medical record to substantiate a claim that the claimant is cognitively impaired to such a degree as to preclude occupational involvement. . . . From a neurologic perspective the claimant would be able to sustain working full time including 8 hour days, 40 hours a week."); Dkt. 50-5 at 38 ("Based on my review of the available medical records from the perspective of my specialty in occupational medicine and having considered all medical conditions both individually and in aggregate, it is my opinion within a reasonable degree of medical certainty that the medical records do not document physical, diagnostic, or imaging findings to support physical function impairment. . . . It is my opinion the claimant could work full-time, 8 hours/day and 40 hours/week."); Dkt. 50-3 at 958, 961 (identifying Sargent's "own occupation," as well as five other sedentary occupations, that Sargent would be able to perform and that also meet the Group Policy's requirements).

After reviewing the complete record, but based primarily on the medical findings of their doctors, Sun Life determined that Sargent was not entitled to benefits under the Plan and notified her on September 28, 2022 (the "Initial Determination"), that her LTD benefits would terminate on September 30, 2022. Dkt. 50-3 at 860–68. Sargent challenged this termination through Sun Life's internal appeals procedure. *See, e.g.*, Dkt. 50-4 at 347–48. Throughout the appeals process, Sargent submitted additional medical records and reports from physicians, mental health providers, and a vocational consultant to support her contention that her functional limitations preclude her

from meeting the physical and cognitive benchmarks to be able to work as required under the Plan. *E.g.*, Dkt. 50-4 at 283–86 (September 26, 2022 progress notes by Dr. Dean M. Donahue); Dkt. 50-3 at 841–52 (April 6, 2023 report by Dr. Walter Panis); Dkt. 50-4 at 175–78 (April 11, 2023 progress notes by Dr. Hsinlin Thomas Cheng); Dkt. 50-4 at 134–36 (May 13, 2023 follow-up visit notes by Dr. Donahue); Dkt. 50-3 at 854–58 (August 2, 2023 response to peer reviews by Dr. Panis); Dkt. 50-4 at 16–21 (August 29, 2023 follow-up visit notes by Dr. Cheng); Dkt. 50-2 at 58–81 (November 15, 2023 report by Vocational Rehabilitation Consultant Rhonda Jellenik); Dkt. 50-11 at 473–98 (November 20, 2023 report by Nurse Laura Reilley); Dkt. 50-1 at 27–31 (January 23, 2024 additional report by Dr. Panis); Dkt. 50-1 at 13–14 (March 6, 2024 response to peer reviews by Dr. Bekken).  Simultaneously, Sun Life engaged several consultants—including, but not limited to, specialists in occupational medicine and psychology—who reviewed the record and concluded that the evidence did not support Sargent's claimed functional limitations.[5]  *See, e.g.*, Dkt. 50-11 at 411–45 (October 31, 2023 report by Dr. Andrew M. Nava); Dkt. 50-1 at 78–87 (October 31, 2023 report by Dr. Margaret O'Connor); Dkt. 50-11 at 510–21 (January 24, 2024 addendum to report by Dr. Nava); Dkt. 50-11 at 522–26 (January 26, 2024 addendum to report by Dr. O'Connor); Dkt. 50-11 at 537–41 (February 9, 2024 report by Vocational Rehabilitation Consultant Kevin M. Williams); Dkt. 50-11 at 596–602 (March 22, 2024 addendum to report by Dr. O'Connor); Dkt. 50-11 at 603–05 (March 29, 2024 addendum to report by Dr. Nava).  Sun Life issued its final decision (the "Final Determination") on April 11, 2024, concluding that Sargent could perform a sedentary "Gainful Occupation" with "reasonable continuity" and was therefore no longer disabled under the Plan.  Dkt. 50-11 at 606–29.

---

[5] Sargent requested and received extensions from Sun Life, in order to provide Sargent with sufficient time to collect evidence for her appeal.  *See, e.g.*, Dkt. 50-2 at 85; Dkt. 50-3 at 874–76..

### B.    Procedural History

Sargent initiated this action on June 9, 2024, alleging that Sun Life's denial of benefits was unreasonable, arbitrary, and capricious.  Compl. ¶¶ 93–110.[6]  The parties filed cross-motions for summary judgment on September 29, 2025.  Dkts. 44, 47; *see also* Dkts. 45, 48.  The parties filed oppositions on October 29, 2025, Dkts. 51–52, and replies on November 12, 2025, Dkts. 53–54.

## II.    Standard of Review

"In the ERISA context, motions for summary judgment 'are nothing more than vehicles for teeing up ERISA cases for decision on the administrative record.'"  *Ministeri v. Reliance Standard Life Ins. Co.*, 42 F.4th 14, 21 (1st Cir. 2022) (quoting *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 n.2 (1st Cir. 2016)).  A consequence of this rule is that "the burdens and presumptions normally attendant to summary judgment practice do not apply." *Stephanie C.*, 813 F.3d at 425 n.2 (citation omitted).   "Because the focus of the court's review in an ERISA case is the final administrative decision, 'the district court sits more as an appellate tribunal than as a trial court.'"  *Taylor v. Liberty Life Assurance Co. of Bos.*, 2022 WL 3108810, at *2 (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002)).

When an ERISA claim is based on a denial of benefits, the Court "must assay the Plan 'in order to determine the standard of judicial review applicable to a claims administrator's denial of benefits.'" *Stephanie C.*, 813 F.3d at 427 (quoting *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 379 (1st Cir. 2015)).  A challenge to a denial of benefits must be reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.

---

[6] The Complaint originally also named as a defendant Phillips, Plaintiff's employer and administrator of the Plan, who was dismissed without prejudice after joint motion from the parties.  *See* Dkts. 17, 19.

7

101, 115 (1989); *see also Ministeri*, 42 F.4th at 21 (applying de novo review because the court determined that the language in the plan did not grant "plan administrator discretionary authority to determine eligibility for benefits"). "Where the plan document grants the plan full discretionary authority, the decision is instead reviewed for abuse of discretion." *Taylor*, 2022 WL 3108810, at *2 (collecting cases); *see also Recupero v. New Eng. Tel. & Tel. Co.*, 118 F.3d 820, 824 (1st Cir. 1997) (providing that "the arbitrary and capricious standard applies where the benefit plan vests the [plan administrator] with the discretionary authority to determine benefits eligibility and to construe plan provisions").

## III.    Discussion

### A.    The Plan's Grant of Authority

"[A] reviewing court must first decide whether a benefits plan clearly grants the plan administrator discretionary authority to determine benefits eligibility, since the answer to this question determines whether the court must apply ERISA *de novo* review or an arbitrary and capricious standard to its review of the claim denial decision."[7] *DeSilva v. Guardian Life Ins. Co. of Am.*, 2025 WL 999920, at *5 (D. Mass. Mar. 31, 2025). Here, the Plan states:

> Sun Life has discretionary authority to make all final determinations regarding claims for benefits under the [Group] Policy. This discretionary authority includes, but is not limited to, the right to determine eligibility for benefits and the amount of any benefits due, and to construe the terms of the [Group] Policy.
>
> Any decision made by [Sun Life] in the exercise of this authority, including review of denials of benefit, is conclusive and binding on all parties. Any court reviewing such a decision shall uphold it unless the claimant proves that it was arbitrary and capricious.

---

[7] It is not entirely clear whether this issue is disputed. *Compare* Compl. ¶ 25 ("The Plan does not confer discretion on Sun Life to determine eligibility for benefits or to interpret the terms of the Plan."), *with* Dkt. 48 at 25–27 (Plaintiff's memorandum in support of her motion for summary judgment discussing the discretionary standard of review). Because this is a threshold issue, the Court will address it.

Dkt. 50-7 at 432.  This language clearly and "unambiguously indicate[s] that [Sun Life] has discretion to construe the terms of the plan and determine whether benefits are due in particular instances." *Stephanie C.*, 813 F.3d at 428.

### B.        Abuse of Discretion

Having determined that the Plan grants Sun Life discretionary authority, the Court "must uphold [Sun Life's] decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" *Dutkewych v. Standard Ins. Co.*, 781 F.3d 623, 633 (1st Cir. 2015) (quoting *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 20 (1st Cir. 2014)).  This "standard is generous—the decision must be upheld if there is any reasonable basis for it." *Wallace v. Johnson & Johnson*, 585 F.3d 11, 15 (1st Cir. 2009) (cleaned up).  Notably, "[e]vidence contrary to [Sun Life's] decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Bernitz v. Usable Life*, 149 F.4th 113, 121 (1st Cir. 2025) (quoting *Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005)).  "Specifically, the question is not which side [the Court] believe[s] is right, but whether the administrator had substantial evidentiary grounds for a reasonable decision in its favor." *Ortega-Candelaria*, 755 F.3d at 20 (cleaned up).  Any doubts are typically resolved in favor of the plan administrator. *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003).

### 1.        Plan's Definition

Sargent argues that Sun Life failed to satisfy the Plan's review requirements by failing to apply the "reasonable continuity" component of the definition,[8] evidenced by Sun Life's failure to use this phrase throughout its communications and determinations.  Dkt. 48 at 15, 28–29; Dkt. 51

---

[8] For eligibility after the initial twenty-four-month period, the Plan required a claimant to demonstrate that she "is unable to perform *with reasonable continuity* any Gainful Occupation for which [she is] or could become reasonably qualified for by education, training and experience." Dkt. 50-7 at 416 (emphasis added).

at 10–12. "An abuse-of-discretion inquiry must 'consider the text of the ERISA plan and the plain meaning of the words used therein, which cabin the plan's administrator's discretion.'" *Bernitz*, 149 F.4th at 124 (quoting *Santana-Díaz v. Metro. Life Ins. Co.*, 919 F.3d 691, 695 (1st Cir. 2019)). That said, the Court "need only consider whether [the administrator's] interpretation of the Plan and its application of the Plan terms to the facts of this case was 'reasoned and supported by substantial evidence.'" *Id.* (quoting *O'Shea through O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 (1st Cir. 2016)).

As relevant here, the Plan requires a claimant to demonstrate after twenty-four months that she "is unable to perform with reasonable continuity any Gainful Occupation for which [she is] or could become reasonably qualified for by education, training and experience," Dkt. 50-7 at 416, and "Gainful Occupation" is defined as "employment that is, or can be expected, to provide" an income of at least 50% of the claimant's prior monthly earnings, *id.* at 407, 412. Sargent's argument focuses on Sun Life's failure to include the phrase "reasonable continuity" in some of its communications. As Sun Life correctly points out, Dkt. 51 at 11, at least one of the communications for which Sargent faults Sun Life for failing to quote this language did not contain any decision at all, let alone one that required application of the "reasonable continuity" language, *see* Dkt. 50-6 at 275 (notifying Sargent of the upcoming change in eligibility requirements but making no determination).

More importantly, however, Sargent provides no meaningful basis for the Court to conclude that Sun Life did not apply the "reasonable continuity" provision in conducting its review, as opposed to simply reaching a conclusion with which Sargent disagrees.[9] Sun Life's

---

[9] For largely the reasons set forth by Sun Life, *see* Dkt. 53 at 7–8, the Court finds the cases cited in Sargent's opposition, *see* Dkt. 52 at 6, distinguishable.

experts concluded that Sargent would be able to work "full time." *See e.g.*, Dkt. 50-9 at 115 ("From a neurologic perspective the claimant would be able to sustain working full time including 8 hour days, 40 hours a week."); Dkt. 50-5 at 38 ("It is my opinion the claimant could work full-time, 8 hours/day and 40 hours/week.").  The use of the words "full time," rather than using the plans' language of "with reasonable continuity," does not mean that Sun Life applied the wrong standard.  *See Rodríguez-López v. Triple-S Vida, Inc.*, 2018 WL 637397, at *9 (D.P.R. Jan. 30, 2018) (concluding after a *de novo* review that claimant had met her burden to show she could not work "with reasonable continuity" because "she showed that her fibromyalgia and other physical conditions prevent her from working any job full-time because she cannot sit, stand, or walk, for more than a total of six hours a day").

Additionally, in denying Sargent's applicant for LTD benefits, both the Initial Determination and the Final Determination clearly state that Sun Life is applying the Plan's definitions, including "reasonable continuity" provision.  *See* Dkt. 50-3 at 861 (quoting the "reasonable continuity" provision in making an initial determination that Sargent no longer met her burden to prove entitlement to benefits beyond September 28, 2022); Dkt. 50-11 at 624 (quoting the full Plan language, including the "reasonable continuity" provision in the Final Determination).  The mere fact that Sun Life failed to repeatedly use the phrase "reasonable continuity" throughout its explanation does not demonstrate that it failed to apply the correct standard.

As discussed in more detail below, *see infra* Section III.B.3, the Court concludes that Sun Life's "interpretation of the Plan and its application of the Plan terms to the facts of this case was 'reasoned and supported by substantial evidence.'"  *Bernitz*, 149 F.4th at 124 (quoting *O'Shea*,

11

837 F.3d at 73). Accordingly, the Court finds no abuse of discretion in Sun Life's application of the Plan's definition.

### 2. Procedural Issues

#### a. Structural Conflict of Interest

There is no dispute that there is a structural conflict inherent in the Plan, *see* Dkt. 48 at 25; Dkt. 45 at 36, but the parties dispute whether and how this conflict changes the Court's abuse of discretion review.[10] "[T]he presence of a conflict of interest does not change the standard of review" for abuse of discretion, but such a conflict "can, under certain circumstances, be accorded extra weight in the court's analysis." *Cusson v. Liberty Life Assurance Co. of Bos.*, 592 F.3d 215, 224 (1st Cir. 2010), *abrogated in part on other grounds by*, *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136 (2016). Thus, the Court is "duty-bound" to investigate what steps an administrator has taken to insulate its decision-making from the "potentially pernicious effects" of such conflicts. *Denmark v. Liberty Life Assurance Co. of Bos.*, 566 F.3d 1, 9 (1st Cir. 2009). A plaintiff "bears the burden of showing that the conflict influenced [defendant's] decision." *Cusson*, 592 F.3d at 225 (citing *Terry v. Bayer Corp.*, 145 F.3d 28, 34 (1st Cir. 1998)).

Sun Life argues that "is not an important factor" because there is no evidence "that the hypothetical conflict actually influenced the benefits decision in some way," and "the procedural safeguards apparent throughout the record demonstrate precisely the kind of 'active steps' that Courts recognize to reduce the risk of bias and promote accuracy." Dkt. 45 at 36 (citations omitted). The Court agrees, because Sargent has not demonstrated that the conflict actually

---

[10] The Plan has a structural conflict because Sun Life "both evaluates claims for benefits and pays benefits claims." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).

impacted Sun Life's decision.[11]  The record is replete with evidence that Sun Life took sufficient steps to insulate its claims determination process, including by "select[ing] independent physicians to analyze [Sargent's] medical records[,] . . . us[ing] a separate appeals unit to review the initial denial[,] . . . ma[king] good-faith benefit payments under reservation of rights" while Sargent's appeal was pending, and "continu[ing] [to] review[] updated medical records." *Bernitz*, 149 F.4th at 122.  Nor is there contrary evidence.  *See id.* at 123 (listing relevant types of "evidence that merits putting more weight on the structural conflict" (citations omitted)); *see also Germana v. Hartford Life & Accident Ins. Co.*, 2024 WL 3416026, at *4 (D. Mass. July 15, 2024) ("The bald fact that Defendant made an adverse benefits determination is not evidence of bias or unfair claims processing.").  As such, the structural conflict is afforded little weight.  *See Bernitz*, 149 F.4th at 122–23 (citing *Glenn*, 554 U.S. at 117).

### b.    <u>Sufficient Explanation</u>

Sargent also argues that Sun Life's Final Determination failed to provide her with a sufficient explanation for terminating her LTD benefits, as required by 29 U.S.C. § 1133, and that she was denied the opportunity to review and respond to evidence.  *E.g.*, Dkt. 45 at 27–30.

ERISA requires the denial "set[] forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133; *see also Ministeri*, 42 F.4th at 27 ("ERISA and its implementing regulations clearly mandate that any denial of benefits claimed must be accompanied by a written notice 'setting forth the specific reasons for such denial.'" (quoting 29 U.S.C. § 1133)).  "[T]he denial letter need not detail every bit of information in the record[,] [but] it must have enough information to render the decision to deny benefits

---

[11] *See also infra* Section III.B.3 (discussing the reasonableness of Sun Life's determination).

susceptible to judicial review." *Taylor*, 2022 WL 3108810, at *3 (quoting *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 526 (1st Cir. 2005)).

Sargent's arguments effectively ask the Court to look at the Final Determination in a vacuum, which is neither required nor appropriate. The Final Determination references the Initial Determination, as well as numerous other prior correspondences, *see* Dkt. 50-11 at 607, and therefore the Court also considers the explanations provided in the earlier letters, *see Taylor*, 2022 WL 3108810, at *4–5. From the Initial Determination through the Final Determination, Sun Life has consistently identified the claim history, the relevant policy terms, the evidence considered, the opinions offered by Sargent's treating physicians, and those expressed by the independent physicians consulted by Sun Life (whose opinions at times directly respond to Sargent's treating physicians' opinions). *See, e.g.*, Dkt. 50-3 at 860–68 (the Initial Determination); Dkt. 50-11 at 606–29 (the Final Determination). After Sargent appealed the initial decision and provided additional information, *see, e.g.*, Dkt. 50-1 at 13–14, 27–31; 50-2 at 58–81; Dkt. 50-3 at 841–52, 854–58; Dkt. 50-4 at 16–21, 134–36, 175–78, 283–86; Dkt. 50-11 at 473–98, Sun Life engaged additional experts and provided Sargent opportunities to review and respond to those new opinions, *see, e.g.*, Dkt. 50-1 at 78–87; Dkt. 50-11 at 411–45, 510–26, 537–41, 596–602, 603–05. Further, the decision letters directly reference and quote from Sun Life's expert's reports, *see e.g.*, Dkt. 50-3 at 862–68; Dkt. 50-11 at 607–23, all of which considered Sargent's medical history and many of which directly analyzed and addressed in turn Sargent's expert's opinions and reports, *see, e.g.*, Dkt. 50-10 at 39–42 (identifying flaws in Sargent's doctor's (Dr. Bekken) analysis); Dkt. 50-11 at 519 (reviewing supplemental reports from Sargent's doctor and concluding "there are no new or updated physical examination findings documented that can be translated into a functional deficit or impairment").

This is not a case where the lack of explanation in the letters themselves hid from Sargent the basis for the denial of benefits. *Cf. Ministeri*, 42 F.4th at 28 ("Reliance's written denial letters to the plaintiff discuss only the issue of Ministeri's qualification for the eligible class; they are silent on portability. To the extent that Reliance now attempts to ground its denial of supplemental coverage on Ministeri's failure to apply for portability, that attempt is problematic."). The letters together explain that Sun Life relied on Sun Life's doctors' opinions over Sargent's doctors' opinions, and those opinions from Sun Life's doctors in turn directly address Sargent's doctors' opinions and their shortcomings. In total, the Final Determination's twenty-two pages recounting the long procedural history, the evidence considered, and Sun Life's conclusion, alongside the over 6,500-page record, satisfies the requirements of 29 U.S.C. § 1133. *See Niebauer v. Crane & Co., Inc.*, 783 F.3d 914, 927 (1st Cir. 2015) (concluding that a "two-page memorandum . . . [that] provided a procedural and factual background, in addition to a description of the relevant provisions of the plan and the information the committee considered in arriving at its decision, before summarizing its conclusion . . . satisfies ERISA's notice requirements"); *see also Orndorf*, 404 F.3d at 526 ("The denial letter need not detail every bit of information in the record."). While a more robust explanation in the Final Determination may be preferrable, after three years of eligibility review and back-and-forth correspondence between the parties, the Court cannot say that the explanation provided here lacked sufficient detail such that Sargent was unable to respond.

Even accepting Sargent's arguments that Sun Life committed procedural violations, Sargent has failed to demonstrate that she was prejudiced by any such violations. *Stephanie C.*, 813 F.3d at 425 ("[E]ven if the claimant shows that procedural irregularities have occurred in the course of a review, we typically require her to show prejudice as well." (first citing *Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 240–41 (1st Cir. 2006); then citing *Recupero*, 118 F.3d at 840)).

15

Sargent identifies no new factual information or legal arguments that she would have submitted, as opposed to merely continuing to respond in a similar manner to the Final Determination letter and the evidence cited therein. *See, e.g.*, Dkt. 54 at 14; *cf. Ministeri*, 42 F.4th at 28–29 (affirming finding of prejudice where the plan administrator's lack of notice to the plaintiff prevented plaintiff from having the opportunity to meaningfully challenge the rationale behind the denial).

While Sargent argues that she was not given the opportunity to review the opinions of Drs. O'Connor and Nava, Dkt. 47 at 29–30, the record demonstrates that she received copies of both reports on November 7, 2023, *see* Dkt. 50-11 at 446, 453–54. Afterwards, Sargent submitted additional records and reports. *See, e.g.*, Dkt. 50-1 at 26–31 (submitting a response by Dr. Panis to "Sun[]Life's peer reviews"); Dkt. 50-2 at 56–83 (submitting a vocational assessment report by Ms. Jellenik). In response, Drs. O'Connor and Nava both prepared addendum reports, which were shared with Sargent on February 12, 2024. *See* Dkt. 50-11 at 569, 580. Sargent then submitted further responses, additional medical records, and another letter from Dr. Bekken. *See, e.g.*, Dkt. 50-1 at 12–14 (submitting a response by Dr. Bekken to "Sun Life's peer reviews"); Dkt. 50-1 at 15–22 (submitting additional medical records). Once again, Drs. O'Conner and Nava prepared addendum reports. *See* Dkt. 50-11 at 596–605. While Sun Life did not provide further opportunities for Sargent to respond, Sargent has not identified, nor has this Court, any new evidence or rationale in those final reports for which Sargent lacked the opportunity to respond. *Cf. Jette v. United of Omaha Life Ins. Co.*, 18 F.4th 18, 32 (1st Cir. 2021) (concluding claimant had been prejudiced where "she did not have the opportunity to review and respond to [a doctor's] report before [defendant] rendered its final determination on appeal" which relied on the report). As observed by the Tenth Circuit, allowing "a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal—even when those reports contain no

16

new factual information and deny benefits on the same basis as the initial decision—would set up an unnecessary cycle of submission, review, re-submission, and re-review." *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007); *see also Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 895 (8th Cir. 2009) (noting that an extra cycle of review would undoubtedly prolong the appeal process which is normally supposed to take forty five days to complete (citing *Metzger*, 476 F.3d at 1166)); *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245–46 (11th Cir. 2008) (agreeing with the reasoning in *Metzger*). As such, the Court finds no basis to overturn Sun Life's determination on procedural grounds.

### 3.      Reasonableness

Sun Life identified extensive support for its conclusion that Sargent was not entitled to benefits under the Plan. While Sargent points to contrary evidence, "[e]vidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Bernitz*, 149 F.4th at 123 (alteration in original) (quoting *Wright*, 402 F.3d at 74). "[E]vidence is 'substantial' when it is 'reasonably sufficient to support a conclusion.'" *Desrosiers v. Hartford Life & Accident Ins. Co.*, 515 F.3d 87, 92 (1st Cir. 2008) (quoting *Wright*, 402 F.3d at 74). The Court concludes that Sun Life had substantial evidence to support its decision to deny Sargent's claims, and thus its determination was reasonable. *See Ortega-Candelaria*, 755 F.3d at 20 ("Specifically, the question is not which side [the Court] believe[s] is right, but whether the administrator had substantial evidentiary grounds for a reasonable decision in its favor." (cleaned up)). The Court addresses Sargent's specific arguments in turn.

### a.      Treating Physicians

Sargent contends that Sun Life improperly dismissed the reports of her physicians in favor of Sun Life's physicians. *E.g.*, Dkt. 45 at 30–31; Dkt. 52 at 23–24; Dkt. 54 at 12–14. But "administrators are not obliged to accord special deference to the opinions of treating physicians."

17

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *see also Morales-Alejandro v. Med. Card Sys., Inc.*, 486 F.3d 693, 700 (1st Cir. 2007) ("[A] plan administrator is not obligated to accept or even to give particular weight to the opinion of a claimant's treating physician.").  Nor does the "mere existence of contrary medical evidence . . . render arbitrary and capricious a plan administrator's decision to credit one opinion over another."  *Ortega-Candelaria*, 755 F.3d at 28 (citing *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004)).

Here, the record does not suggest that Sun Life "arbitrarily refuse[d] to credit [Sargent's] reliable evidence."  *Id.* at 20 (quoting *Black & Decker*, 538 U.S. at 834).  It was not unreasonable for Sun Life to credit the opinions based on the physical examinations or other reliable objective evidence of Sargent's functional status over those opinions that focused mainly on her subjective symptom reports.  *See, e.g.*, *Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of [the claimant's] subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator."), *aff'd*, 62 Fed. App'x 413 (2d Cir. 2003), *cert. denied*, 540 U.S. 966 (2003).  The record reflects that Sun Life considered and rejected Sargent's complaints that her pain was so severe as to prevent her from working, as reported by herself and by her treating physicians, essentially because its doctors determined that there was no objective evidence *of that level of pain* to corroborate her claims.  *See, e.g.*, Dkt. 50-9 at 115 ("No detailed cognitive testing is documented in the medical record to substantiate a claim that the claimant is cognitively impaired to such a degree as to preclude occupational involvement. . . . From a neurologic perspective the claimant would be able to sustain working full time including 8 hour days, 40 hours a week."); Dkt. 50-10 at 39–42 (identifying flaws in Sargent's

18

doctor's (Dr. Bekken) analysis); Dkt. 50-11 at 510–19 (considering medical records and reports by Sargent's physicians and concluding that Sargent "can work 8 hours per day, 5 days per week" subject to certain functional limitations); *see Pettaway v. Tchrs. Ins. & Annuity Ass'n of Am.*, 699 F. Supp. 2d 185, 205 (D.D.C. 2010) ("In reviewing the plaintiff's claim, [the plan administrator's doctors] specifically considered the evidence provided by [plaintiff's doctor], and they both found inconsistencies and contradictions in his findings."), *aff'd*, 644 F.3d 427 (D.C. Cir. 2011).

For example, one doctor reported after conducting physical examinations that Sargent had a "regular" cardiac rate and rhythm and "normal motor strength" with "normal muscle bulk and tone" and "intact sensation" across Plaintiff's back, arms, and shoulders. Dkt. 50-4 at 285 (notes from a 2022 visit with Dr. Donahue). He also noted "mild tenderness" and "irritability" in certain locations. *Id.* Similarly, another doctor noted:

> Sensation on the face was normal. Corneals were intact. She has no allodynia. Sensation in the arms and legs are normal. Manual muscle testing is normal. Reflexes are 2+ throughout except for the one at the right ankle. Finger-to-nose, heel-to-shin and rapid alternating movements done well. Her Romberg was negative. Her gait was normal.

Dkt. 50-3 at 851 (report from April 2023 by Dr. Panis). That is not to say that there is *zero* objective evidence in the record to support Sargent's claimed pain, *see, e.g.*, Dkt. 50-4 at 285 (notes from a 2022 visit with Dr. Donahue that include the observation that Sargent presented symptoms of "palpable spasm of the scalene and pectoralis minor muscles bilaterally")—just that it was not

19

unreasonable to conclude that such evidence did not corroborate the extreme level of pain and resulting physical limitations that Sargent claimed.[12]

Thus, in this case, the Court cannot say that Sun Life acted unreasonably by giving more weight to its own medical consultants over Sargent's doctors.  *See Vlass v. Raytheon Emps. Disability Tr.*, 244 F.3d 27, 32 (1st Cir. 2001) ("It is the responsibility of the Administrator to weigh conflicting evidence." (citing *Guarino v. Metro. Life Ins. Co.*, 915 F. Supp. 435, 445 (D. Mass. 1995))); *Prince v. Metro. Life Ins. Co.*, 2010 WL 988730 at *12 (D.N.H. March 16, 2010) (explaining that a claimant's "subjective claims of disability do not acquire objectivity or independence merely by virtue of being transcribed in a doctor's note").  "Consequently, 'in the presence of conflicting evidence, it is entirely appropriate . . . to uphold the decision of the entity entitled to exercise its discretion.'"  *Ortega-Candelaria*, 755 F.3d at 20–21 (quoting *Medina v. Metro. Life Ins. Co.*, 588 F.3d 41, 46 (1st Cir. 2009)); *see also Testa v. Hartford Life Ins. Co.*, 2012 WL 1701332, at *1 (2d Cir. May 16, 2012) ("[T]hat [the plan administrator] chose to credit its

---

[12] In her opposition, Sargent also points to various clinical findings and observations of pain.  Dkt. 52 at 16–18 (citations omitted).  But neither Sun Life nor its doctors concluded that Sargent had *no pain*; instead, they concluded that based on the evidence presented, the pain did not rise to such a level as to meaningfully impair Sargent's executive and other cognitive functions and prevent her from working in any gainful occupation with reasonable continuity.  *See Santana-Díaz*, 919 F.3d at 696 (upholding denial of benefits where the plan administrator "did in fact consider the evidence that [claimant] alleges that it overlooked, but [the plan administrator] determined that the evidence did not satisfactorily prove that [claimant] was eligible for LTD benefits under the Plan.").

own doctors over [plaintiff's] treating physicians is not, in and of itself, grounds for reversing the determination.").[13]

### b.       Sargent's Self-Assessments

Sargent also argues that Sun Life improperly ignored her self-assessments as to her condition.  Dkt. 52 at 20–21.  But there is no evidence that Sun Life ignored this evidence; instead, the record illustrates that Sun Life considered and rejected Sargent's self-assessments because Sun Life and its doctors determined that her claims were inconsistent with the medical evidence.  *See supra* Section III.B.3.a.  Sargent has identified no basis for this Court to conclude that this was unreasonable: such a weighing of conflicting evidence is exactly what Sun Life is required to do. *See Vlass*, 244 F.3d at 32 ("It is the responsibility of the Administrator to weigh conflicting evidence." (citing *Guarino*, 915 F. Supp. at 445)); *see also Desrosiers*, 515 F.3d at 93 ("[I]t is permissible [for administrators] to require objective support that a claimant is unable to work."); *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 841 (8th Cir. 2006) (rejecting plaintiff's subjective complaints as basis for proving disability in light of an "administrator's obligation to protect the plan's trust property by ensuring that disability claims are substantiated" (citing *Boardman v. Prudential Ins. Co.*, 337 F.3d 9, 16–17 (1st Cir. 2003))).

---

[13] Sargent also argues that Sun Life's doctors were impermissibly practicing medicine with a Massachusetts license.  Dkt. 47 at 34.  As explained by another court in this District:

> Plaintiff does not cite any case law supporting the proposition that [the plan administrator's doctors] broke Massachusetts law by reviewing Plaintiff's medical records and opining on his functional capabilities as part of Defendant's review of his appeal.  In view of the introductory passage of the definition of the practice to medicine, the court is not convinced that [the plan administrator's doctors] engaged in the unlicensed practice of medicine by reviewing Plaintiff's medical records in connection with providing a disability evaluation.

*Germana*, 2024 WL 3416026, at *5.  This Court agrees.

### c.        Social Security Determination

Finally, Sargent argues that Sun Life failed to credit the SSA's decision to award her disability benefits.  Dkt. 48 at 32–33.  But the First Circuit has made clear that "benefits eligibility determinations by the [SSA] are not binding on disability insurers." *Pari-Fasano v ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000).  The First Circuit has further recognized that there is limited value in the SSA's benefits decision where it is based on an eligibility review that *predates* the termination of plan benefits.  *See id.* ("Hartford's reason for terminating appellant's benefits was a lack of evidence that she remained disabled *in February of 1996.*  On that issue, the social security litigation is singularly uninformative, because, although appellant continues to receive social security disability benefits, no review of her eligibility has been undertaken since 1992." (emphasis in original)).[14]

While Sargent is correct that the regulations required Sun Life to explain "the basis for disagreeing with . . . [a] disability determination regarding the claimant presented by the claimant to the plan made by the [SSA]," 29 C.F.R. § 2560.503-1(j)(6)(i)(C), Sun Life adequately provided this explanation.  The Final Determination acknowledged the SSA's determination, but explained that (1) the SSA's eligibility review predates September 2022, which is the period relevant to the plan determination; (2) the criteria used by the SSA differ from the standards and definitions in the Group Policy; (3) and Sun Life's decision relied on "updated treatment records from 2021, 2022, and 2023" and the opinions of doctors which were not available to the SSA.  Dkt. 50-11 at

---

[14] Sargent argues that the SSA determination relied on a "standard of disability" that was "more rigorous" than that of the Plan, and thus "should be given 'controlling weight.'"  Dkt. 48 at 32–33.  But because the SSA determination was made prior September 2022—the date for which Sargent needed to established eligibility under the Plan—and thus without the benefit of evidence from 2021 onward, the Court need not resolve whether the standards were the same, as it cannot be entitled to controlling weight regardless.  *See Pari-Fasano*, 230 F.3d at 420 (conducting no analysis of whether the SSA's criteria are identical to the relevant plan's criteria where the SSA had not conducted an eligibility review during the relevant time period).

627–28. This explanation is sufficient. *See Taylor*, 2022 WL 3108810, at *3 ("[T]he denial letter need not detail every bit of information in the record[, but] it must have enough information to render the decision to deny benefits susceptible to judicial review." (quoting *Orndorf*, 404 F.3d at 526)). Furthermore, the Court cannot say that Sun Life's determination was unreasonable, especially where it was based on additional evidence that the SSA did not review. *See Rogers v. Unum Life Ins. Co. of Am.*, 2024 WL 1466728, at *11 (D. Mass. Mar. 31, 2024) ("After receiving the SSA determination, [defendant] took additional steps to address the content of the SSA decision at length, and conducted subsequent reviews by its medical consultants . . . Accordingly, [defendant's] actions with regard to the SSA were reasonable."); *see also Pari-Fasano*, 230 F.3d at 420 ("Hartford's reason for terminating appellant's benefits was a lack of evidence that she remained disabled *in February of 1996.* On that issue, the social security litigation is singularly uninformative, because, although appellant continues to receive social security disability benefits, no review of her eligibility has been undertaken since 1992." (emphasis in original)).

## IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 44, is GRANTED and Plaintiff's motion for summary judgment, Dkt. 47, is DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Dated: May 29, 2026                Judge, United States District Court